51 CCPA(Customs)
### Application of Herman HOEKSEMA.
### Patent Appeal No. 7050.

United States Court of Customs
and Patent Appeals.

June 4, 1964.

George T. Johannesen, Kalamazoo, Mich. (Eugene O. Retter, Kalamazoo, Mich., of counsel), for appellant.

Clarence W. Moore, Washington, D. C., (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

Hoeksema appeals from an affirmance by the board of the rejection of claims 1 to 11, 13 to 15 and 17 to 19 of his application [1] for a patent on "Composition of Matter and Process."

The invention relates to the antibiotic dihydronovobiocin and its preparation. According to appellant's specification novobiocin exists in two crystalline forms with only one structural formula, but somewhat different physical properties. Appellant explains that Form 1 is readily absorbed into the blood stream from aqueous vehicles, but Form 2 is not. Since administering novobiocin in aqueous vehicles is said to be desirable, Form 1 is more desirable than Form 2. However, the application states that Form 1 "has been difficult to prepare in good yields since crystalling Form 2, the more stable form, became available."

Claims 1 and 13 read:

"1. Dihydronovobiocin.

"13. A process which comprises contacting an organic solvent solution of 7-[4-(carbamoyl-oxy)-tetrahyro-3-hydroxy-5-methoxy-6, 6-dimethylpyran-2-yloxy] -4-hydroxy-3-[4-hydroxy-3-(3-methyl-2-butenyl)-benzamido'-8-methyl-coumarin with hydrogen in the presence of a hydrogenation catalyst effective to hydrogenate an ethenoid double bond and

recovering the formed 7-[4-(carbam-oyl-oxy) tetrahydro-3-hydroxy-5-methoxy-6,6-dimethylpyran-2-yloxy]-4-hydroxy-3-[4-hydroxy-3-(3-methyl-butyl) benzamido]-8-methylcoumar-in."

The references are:

Peck 2,498,574 February 21, 1950.

Hochstein et al., 76 J. Am. Chem. Soc. 5080–2, October 1954.

Berger et al., 73 J. Am. Chem. Soc. 5295–7, November 1951.

Flynn et al., 76 J. Am. Chem. Soc. 3126, June 1954.

The Peck patent discloses the conversion of streptomycin salts to the corresponding dihydrostreptomycin salts by reacting an aqueous solution of the strep-tomycin salt with hydrogen in the presence of a catalyst of a noble metal such as platinum, palladium or platinum oxide. The dihydro compounds are said to be approximately as active antibiotically as the streptomycin salts and are equally suitable for clinical application. Peck also teaches that the dihydro salts are more stable in the presence of substances capable of reacting with carbonyl groups and also are stable for twenty-four hours in a designated buffered aqueous solution while the corresponding streptomycin salts are completely inactivated therein.

Hochstein discloses two antibiotics, magnamycin and magnamycin B, both elaborated from a strain of streptomyces bacteria, and states that the "Catalytic hydrogenation of Magnamycin B shows the presence of two carbon-carbon bonds." The article specifically describes the preparation of tetrahydromagnamycin B by hydrogenating magnamycin B in anhydrous ethanol in the presence of a palladium-charcoal catalyst.

Berger discloses isolation of crystalline antibiotics from three strains of streptomyces, the antibiotics being identified as X-206, X-464 and X-537A, which are said to be organic acids. The Berger article describes hydrogenation experiments carried out with the antibiotic X-206 with prehydrogenated plat-inum oxide as a catalyst, which resulted in the absorption of 1.2 moles of hydrogen in methanol and 3 moles of hydrogen in acetic acid. The products are said to be amorphous and biologically inactive.

Flynn discloses hydrogenation of erthromycin in the presence of a platinum catalyst with glacial acetic acid as the solvent, and states that one mole equivalent of hydrogen is absorbed.

The board stated:

"* * * Each of these references discloses hydrogenation of strepto-myces-derived antibiotics such as streptomycin, magnamycin and erythromycin to produce the corresponding hydrogenated compounds. Peck in hydrogenating streptomycin obtained a compound of greater stability. The procedure carried out in these references is the usual one with the aid of catalysts and solvents. The examiner held that since it was routine practice to hydrogenate various antibiotics, particularly in order to determine structural configuration, appellant's hydrogenation of novobiocin was obvious and routine."

On that ground the board affirmed the examiner's rejection of process claims 13 to 15 and 17 to 19, but disagreed with the ground of rejection of product claims 1 to 11, saying:

"* * * As to these product claims, it would appear that the Examiner is rejecting because he considers the *manner* in which the product was obtained is obvious which is contrary to 35 U.S.C. 103. Ex parte Burtner et al., 89 USPQ 547, and Ex parte Mowry, Patent No. 2,617,831 are illustrative of this Board's position on the independence of product and process claims for purposes of determining patentability."

Thus the board regarded the examiner as considering dihydronovobiocin obvious because it was known to hydrogenate antibiotics generally, i. e. to determine the presence of unsaturation, and novobiocin was a known antibiotic.

The board substituted its own ground of rejection of the product claims, under Rule 196(b), stating that

"However, insofar as this case is concerned novobiocin is a known material and its structure is set out by formula on page 1 of the specification. This is necessary background for claims 1 through 11; otherwise they would be indefinite if not meaningless in "novobiocin." However, the structure of novobiocin clearly indicates to the chemist that it may be hydrogenated because of the carbon to carbon unsaturation which also happens to be the type of unsaturation hydrogenated by Hochstein et al. * * *"

The board thus regarded dihydronovobiocin to be obvious in view of the structure of novobiocin and the conventionality of hydrogenation. In other words, the presence of unsaturation in novobiocin suggested hydrogenation thereof because other unsaturated antibiotics have been similarly hydrogenated in the prior art.

█ We agree with appellant that the board erred in two respects, namely, in assuming that the *structure* of novobiocin was known to the prior art, and in neglecting to consider the properties of dihydronovobiocin vis-a-vis novobiocin.

We observe that, at the time appellant made his invention, those skilled in this art knew that novobiocin existed and that it possessed certain antibacterial properties; its structure, however, was unknown. As we have pointed out, from the teachings of the cited references, a person skilled in this art would have been expected to know also that other antibiotics had been hydrogenated, and that such hydrogenation had produced varying results with respect to the bacterial activity, stability and absorption characteristics of the resulting product. Those facts do not, we think, support the board's conclusion that it would be obvious that hydrogenation of novobiocin would produce the claimed novel compound which appellant produced and which he found to possess antibacterial activity and stability in aqueous vehicles, as well as to be readily absorbed with unusually high blood levels following either oral or parenteral administration.

In In re Viktor Papesch, 315 F.2d 381, 50 CCPA 1084, this court said:

" * * * a formula is not a compound and while it may serve in a claim to *identify* what is being patented, as the metes and bounds of a deed identify a plot of land, the *thing* that is patented is not the formula but the compound identified by it. And the patentability of the thing does not depend on the similarity of its formula to that of another compound but of the similarity of the former compound to the latter. * * *"

Comparing the *compounds* involved, and not merely their structural formulae, the unexpected properties of dihydronovobiocin persuade us that that product is not obvious in view of the cited prior art. Thus we are obliged to reverse the board's rejection of product claims 1 to 11.

Process claims 13 to 15 recite the production of dihydronovobiocin by "contacting" novobiocin, in an organic solvent, with hydrogen "in the presence of a hydrogenation catalyst effective to hydrogenate an ethenoid double bond." Claims 14 and 15 specify the catalyst and solvent respectively. Claims 17 to 19 define the actual reaction steps as simply "hydrogenating the said novobiocin in an organic solvent in the presence of a hydrogenation catalyst effective to hydrogenate the ethenoid double-bond" but state in the preamble:

"17. A process for converting novobiocin in the crystalline form which is not readily absorbed into the readily absorbable and biologically active product * * *."

Thus claims 17 to 19 are directed to converting Form 2, which is readily absorbable into the blood stream, to dihydronovobiocin whereas claims 13 to 15 are directed to converting novobiocin, in either crystalline form, to dihydronovobio-

cin. But whatever the starting material, the specification points out that

"* * * The same product is obtained whether novobiocin Form 1 or Form 2 crystals are used as the starting product or whether a crude novobiocin is hydrogenated and then purified." (Emphasis supplied)

The product, dihydronovobiocin, is said to possess the advantages of novobiocin "* * * and, at the same time, is stable in aqueous vehicles and readily absorbed therefrom."

As may be seen from the references, and as pointed out by both the examiner and the board, it is conventional to hydrogenate antibiotics to determine the presence of unsaturation and thus, in part, determine the structure of the antibiotic molecule. While process claims 13 to 15 and 17 to 19 recite no special conditions or critical limitations to distinguish them from the usual prior art catalytic hydrogenation, the question arises whether the preamble of claims 17 to 19, supra, imparts such a limitation. The latter claims recite the conversion of Form II to dihydronovobiocin whereas the former claims do not define the form of the starting material.

Since the process is otherwise identical, we cannot distinguish between claims 13 to 15 and 17 to 19, on the basis of the starting material as urged by appellant. Indeed, the product is the same regardless of which form of novobiocin is hydrogenated.

■ We find the instant process to be obvious from the clear teachings of record that hydrogenation of antibiotics to elucidate their structure is conventional, and appellant did just that.[2]

Here the instant product is unobvious because of its unexpected properties. In In re Larsen, 292 F.2d 531, 49 CCPA 711, this court held a process to be obvious although it produced a product which, because of its unexpected properties, was unobvious.

While the instant process produces a compound, the properties of which are unexpected, that fact does not necessarily make the process itself unobvious because it is not unexpected that *hydro*genation of *novo*biocin produces *dihydro*novobiocin. Indeed, appellant's purpose in hydrogenating was to produce a dihydro derivative of novobiocin, since obtaining such a product would demonstrate unsaturation in the parent compound.[3] Hochstein is an example of the practice of hydrogenating an antibiotic to determine unsaturation.

■ As this court stated in Larsen, a process may or may not be obvious once "given the idea of the compound" to be produced. Whether the instant hydrogenation process is viewed from the vantage point of the compound to be produced, namely dihydronovobiocin, or as having been conducted for the purpose of elucidating structure, the claimed process, nonetheless, constitutes the conventional hydrogenation of a known antibiotic.

The rejection of claims 1 to 11 is reversed.

The rejection of claims 13 to 15 and 17 to 19 is affirmed.

Modified.

SMITH, Judge (dissenting in part).

I agree with the majority in reversing the board decision with respect to claims 1–11 and affirming it with respect to claims 13–15. I cannot, however, accept the majority's treatment of process claims 17–19.

Claim 17 is the parent claim of this group and reads as follows:

"A process for converting novobiocin in the crystalline form which

---

2. Appellant, in his brief, states:
   "Appellant in attempting to elucidate the structure of novobiocin found that on hydrogenation in alcohol solution novobiocin was converted to a new crystallizing form having all the advantages of novobiocin in regard to antibacterial activity but being free of the disadvantage noted above."

3. See fn. 2, supra.

is not readily absorbed into a readily absorbable and biologically active product which comprises hydrogenating the said novobiocin in an organic solvent in the presence of a hydrogenation catalyst effective to hydrogenate an ethenoid double-bond and recovering the hydrogenated novobiocin from the said solvent solution."

As I view this group of claims, they define appellant's discovery that the stable crystalline form of novobiocin, which was not readily absorbed, could be converted by hydrogenation to the readily absorbable and biologically active dihydronovobiocin. None of the references recognized the problem posed by this particular form of novobiocin as the starting material, and none taught or suggested hydrogenation as a solution to the problem. Yet the board and the majority treat claims 17–19 the same as claims 13–15 and agree with the examiner that, as stated by the board, "since it was routine practice to hydrogenate various antibiotics, particularly in order to determine structural configuration, appellant's hydrogenation of novobiocin was obvious and routine."

In reversing the board as to product claims 1–11, the majority recognizes that appellant made the unexpected and unobvious discovery that if he takes the particularly claimed form of novobiocin, and hydrogenates it, he will obtain a new product having very desirable properties. This discovery was his invention. It is, *as a whole*, the subject matter which he now seeks to patent. 35 U.S.C. § 103. The majority finds this invention to be patentable, when claimed as a product as in claims 1–11. As I see it, process claims 17–19 are but alternative ways of claiming precisely that same patentable invention.

Less than two years ago, this court decided the case of In re Conover, 304 F.2d 680, 49 CCPA 1205, which involved a situation quite similar to the one now before us. To be sure, the subject matter in Conover was claimed as "a method of constructing a roller bearing,"[1] and thus cannot be classified as a "chemical case." However, the principal stated by the court seems equally applicable to the present chemical subject matter. As we said, 304 F.2d at 684, 49 CCPA 1210:

> " * * * it is our conclusion that the invention for which a patent is here sought is one of those inventions where it is doubtful whether the invention resides in the process or the structure and which may be claimed with equal facility in terms either of method or structure. Since both types of claims are recognized by the statute * * *, it is our opinion that both types of claims may properly be allowed to issue in a single patent where, as here, they are but alternative expressions for defining a single invention. * * "

If, however, this analysis of the nature of appellant's invention be incorrect, I still would reverse the rejection of claims 17–19. Under 35 U.S.C. §§ 101 and 103 any new, useful and unobvious process may be patented, and under 35 U.S.C. § 100(b) a patentable process may be a new use of a known process. Appellant has discovered a new use for the known process of hydrogenating antibiotics; namely, converting crystalline novobiocin into a more absorbable product.

[1]. It is interesting to compare claims 17–19 in the present case with claim 1 in Conover:

"A method of constructing a roller bearing of the type employing an annular series of roller bearing elements between concentric cylindrical bearing surfaces on members which have end faces in bearing contact, such method being adapted to prevent roller skewing and including the plating of one of such end faces with a metal having non-galling characteristics when it bears upon the other of said faces."

Clearly, the only operative step in this claimed "method," i. e., "plating * * * with a metal," was a very old and venerable process. The same is true with respect to the only operative step in claims 17–19 of appellant's application, i. e., "hydrogenating."

To say that this new use was obvious ignores the fact that appellant's *particular application* of the old process to a *particular* form of novobiocin produced *wholly unexpected results* with respect to the *properties* of the product obtained thereby.

In my opinion, the majority opinion ignores the clear wording of the statute. Congress must have meant that a process as defined in claims 17–19 may be patentable when it unequivocally stated that an individual may obtain a patent for a "new use of a known process."

I would, therefore, reverse the board as to claims 17–19 as well as claims 1–11, while affirming it as to claims 13–15.